Heather Lynne HARRISON *v.* Robert Brooks HARRISON

CA 07-587

Court of Appeals of Arkansas
Opinion delivered April 9, 2008

*Ann B. Hudson*, for appellant.

*Goodwin Moore, LLP*, by: *Harry Truman Moore*; and *Bristow & Richardson, PLLC*, by: *Melissa B. Richardson*, for appellee.

KAREN R. BAKER, Judge. Appellant, Heather Lynne Harrison, appeals from a decision by the Crittenden County Circuit Court finding that appellant failed to meet her burden of proof in establishing that there has been a material change of circumstances to warrant a change in custody. On appeal, she argues that the trial court erred in not finding that it was in the best interest of the minor child to change custody to appellant. We agree and reverse and remand.

The parties were divorced by decree entered February 23, 2004. The parties had one daughter, O.H., born January 22, 2001. Custody of the three-year-old child was awarded to appellee based on the fact that appellant had been involved in a sexual relationship

with a man during the pendency of the divorce. In a letter opinion of December 2003, the trial court stated, "An obligation of parenthood is to instruct on morals, mores, traditions, and customs. Setting a poor example in a parent's own life is failure to properly instruct."

On July 14, 2005, appellant filed a petition for change of custody alleging that a material change in circumstances had occurred since the original custody determination. Specifically, appellant alleged that appellee was also involved in a relationship with a live-in girlfriend during the parties' pending divorce. This fact was not known to the trial court at the time of the divorce. Appellant also filed a petition for contempt alleging that appellee failed to allow appellant her weekday visitation. In response, appellee filed a counter-petition for modification of the divorce decree asserting that because the needs of the minor child had increased with age and the disposable income of the appellant had increased, a material change in circumstances had occurred since child support was originally set, and child support should be increased to $106 per week.

A hearing was held on the motions on March 7, 2007. Appellee was the first person to testify. He recalled the trial judge rendering its letter opinion in his divorce case. Specifically, he recalled the court stating that an obligation of parenthood is to instruct on morals, mores, traditions, and customs and stating that setting a poor example in a parent's own life is failure to properly instruct. Appellee was of the opinion that he had "done a very good job to set an example and properly instruct" his daughter. However, he testified that he dated Peggy Houston for four to six months during his pending divorce. He took great measures to hide the fact that they were dating, such as hiding her car when she came to his house. Peggy was around O.H. on one occasion. Appellee testified that he continued to date Peggy until after the divorce was finalized. At that time, he began dating Wendy. Wendy was introduced to O.H. on two occasions. Wendy also had a daughter that was O.H.'s age, so the two children played together. Appellee then began dating Melody Harrison. While they dated, "O.H. was around Melody a great deal." During this time Melody became pregnant with his child. She was pregnant when he and Melody finally married on October 23, 2004. He also explained that Melody had another child, born outside of marriage, that was seven years old and that lived in the home with O.H. In response to the question of whether it was a proper

example for his daughter to be in a situation where someone that he was dating became pregnant before they were married, appellee answered "yes and no." He stated, "Yes in the fact that it's taking responsibility for my actions. And no because the child was conceived out of wedlock."

Appellee testified that he was employed by the City of West Memphis Fire Department. He explained that he worked ten, eleven, twelve, and sometimes twenty-four hour shifts. While he was at work, a number of family members, particularly his mother and his aunt, picked up his children and took them back and forth to school. He also stated that "with my work schedule I guess you could say that a lot of my parenting has been turned over to Melody. Prior to turning it over to Melody, before I married her, my mother did a large part of it, my mother and my aunt." He also explained that Melody was in contact with appellant constantly and provided her with updates on school, including homework and school parties. Melody volunteered to be O.H.'s room mother at school, and appellant also was present and helped with school parties. He stated that when he was not working, he sometimes picked the children up at school. When he arrived home from work at seven in the morning, he helped get the children ready for school and if there was breakfast to be fixed, he made it. He testified that "usually [Melody] takes them to school. If she's running late, then I'll take them some and my mom takes them some." When he was able to pick O.H. up from school, he did so.

Appellee testified that he objected to appellant having custody of O.H. because he thought appellant did not spend all of her time with the child and he thought she did not make wise decisions about the child. Specifically, it was important to appellee that O.H. be fed a balanced diet. He felt that appellant did not feed O.H. a properly balanced diet. He based this opinion on one occasion when appellant brought the child to him having had only yogurt for dinner. He then stated, "I don't have any other reason that [O.H.] should not be in the custody of her mother."

When questioned as to the reason he was awarded custody of their daughter, he responded, "The situation with me getting custody of [O.H.] arose out of the fact that [appellant] was seeing someone else during the time that we were separated and prior to the divorce. In fact, I did the same thing. I don't believe I told that at the divorce hearing." He further testified that, "But, yeah, I would guess you're correct in saying that I asked the court to take

custody away from Heather for the very same thing that I was doing at the time and continued to do afterward."

Melody Harrison, appellee's current wife, testified that she was not a high school graduate because she was one credit shy of graduating, but she had not had the time to finish the course and obtain her diploma. She stated that she worked at J and T Flash Monday through Friday. She had two children. She was never married to the father of her first child (a daughter). However, she began seeing Darryn Richards when she was four months pregnant with her daughter. When her daughter was three years old, she and the child moved in with Darryn. She and Darryn eventually married and were married for approximately two years. She and appellee began seeing each other in the spring of 2004, and she soon became pregnant with his child (a son). She testified that she was approximately one month pregnant when she and appellee married.

Melody also testified that she and appellant had a good relationship. She kept appellant informed about O.H.'s school activities and the two of them were both room mothers for O.H.'s classroom. She testified that there was no difference in the way she treated her daughter and O.H. She also testified that O.H. and Melody's daughter got along very well. The two girls were very compatible and enjoyed being together. She testified that appellee's aunt was very helpful in picking up the children from school when both Melody and appellee were at work. Melody testified that she worked from eight to five.

Appellant testified that she learned that appellee had engaged in sexual relationships during the pendency of their divorce only recently. She testified that she thought it was "very unjust" that she lost custody of O.H. over a relationship that she had while appellee "was doing the same thing." She testified that she was involved in a relationship during her pending divorce from appellant; however, she did not have overnight visitors of the opposite sex, nor did she ever place O.H. in an improper situation. The man that she dated was only around O.H. on very few occasions, and he was not ever around O.H. in the evening. Ultimately, appellant did not marry the man that she was dating during the pending divorce.

Appellant testified that during the time appellee had custody of O.H., there was not "anything objectionable in my life for that child to be around. I have not dated anyone that would be

objectionable for [the] child to be around if I was married to them." Since the divorce, appellant purchased a home and decorated a room for O.H. She testified that she and O.H. had spent a significant amount of time with appellant's parents; however, during visits to the grandparents' house, appellant was always there. Appellant testified that she always participated in O.H.'s activities. She worked at St. Jude's Children's Research Hospital from eight to four-thirty Monday through Friday, so she was "just as able as either [appellee or Melody] to get [O.H.] to places that she [needed] to go."

Appellant testified, "I want the Court to change custody because I believe, as her mother, I would be her best caretaker. If [appellee] is not the primary caretaker, I feel it's in the best interest of the child to have her real parent, her mother. I am asking the Court to grant custody to me." Appellant testified that on her nights with O.H., appellant did not leave O.H. with anyone while she attended other activities. Appellant was always with O.H. Appellant's parents were available to pick O.H. up from school and tend to her until four-thirty when appellant got home from work. She stated, "I only want the best for [O.H.]."

Frances Harrison, appellee's mother, testified that she helped care for O.H. after appellee was awarded custody of her. Ms. Harrison spent nights at appellee's house in order to help care for O.H. until he married Melody. She testified that appellee did not have overnight guests of the opposite sex while O.H. was present. She testified that when appellee was working, she and her sister would pick O.H. up from school, and appellee would pick O.H. up from school when he was not working.

At the conclusion of the hearing, the trial court made the following statement:

> First of all the Court's going to comment about the original decision in which the Defendant admitted that he was engaged himself in an adulterous relationship at the time of the divorce and that that information was withheld from the Court. The Court agrees with Plaintiff's contention that that cast the Defendant in a bad light with the Court, the Court feeling that not only is he a cheat, but he's a nefarious and devious cheat, and the Court recognizes that.

The Court further commented on the fact that appellee's character was questionable and that, while it did not *know* that its prior custody determination would have been different had the truth been known,

"it well may be that the decision of the Court would have been different." Nonetheless, the trial court entered an order in which it concluded that appellant failed to meet her burden of proving that there had been a material change in circumstances warranting a change in custody and that it would be in the best interest of the child to remain in the custody of the appellee. The court also found that appellant was entitled to make up the day of visitation that she missed on August 16, 2006; that due to the circumstances under which appellant missed her visitation, appellee was not in contempt; that the issues raised in appellee's counter-petition for modification of child support were resolved by the order; and that each party should bear their respective costs for attorney's fees. From this order, comes this appeal.

The court of appeals reviews child custody cases de novo, but does not reverse absent a finding that the circuit court's findings were clearly contrary to the preponderance of the evidence. *Carver v. May*, 81 Ark. App. 292, 101 S.W.3d 256 (2003). A finding is clearly erroneous when, although there is evidence to support it, the reviewing court is left with a definite and firm conviction that a mistake has been made. *Id.* Especially in child-custody cases, the circuit court receives exceptional deference because of its superior position to evaluate and judge the credibility of the witnesses. *Id.* It is well settled that the primary concern in child-custody cases is the child's welfare and best interest; all other considerations are merely secondary. *Id.*; *Eaton v. Dixon*, 69 Ark. App. 9, 9 S.W.3d 535 (2000). Before a custody order can be changed, the court must be presented with proof of material facts which were unknown to the court at the time of the initial custody order or proof that conditions have so materially changed as to warrant a custody modification and that the best interest of the child requires it. *Carver, supra.*

Determining whether there has been a change of circumstances that materially affects the children's best interest requires a full consideration of the circumstances that existed when the last custody order was entered in comparison to the circumstances at the time the change of custody is considered. *Blair v. Blair*, 95 Ark. App. 242, 235 S.W.3d 916 (2006). Custody will not be modified unless it is shown that there are changed conditions demonstrating that a modification is in the best interest of the child. *Vo v. Vo*, 78 Ark. App. 134, 79 S.W.3d 388 (2002).

The circuit court's findings in this regard will not be reversed unless they are clearly erroneous. *See Vo, supra.* While custody is always modifiable, appellate courts require a more rigid standard for custody modification than for initial custody determinations in order to promote stability and continuity for the children and to discourage repeated litigation of the same issues. *Id.* There are no cases in which the superior position, ability, and opportunity of the circuit judge to observe the parties carries a greater weight than those involving the custody of minor children, and our deference to the circuit judge in matters of credibility is correspondingly greater in such cases. *Id.*

Appellant asserts that the trial court erred in denying her petition to change custody of the parties' minor daughter to her. In essence, appellant asserts that the trial court erred in failing to find that a material change in circumstances had occurred since the entry of the divorce decree and that it would be in the best interest of the child for appellant to have custody. We agree that appellant proved that a material change in circumstances transpired since the entry of the divorce decree.

In *Mason v. Mason*, 82 Ark. App. 133, 111 S.W.3d 855 (2003), this court held that in order to avoid relitigation of factual issues already decided, courts will usually restrict evidence in a modification proceeding to facts arising since the prior order; the only other time a change is permissible is when there is a showing of facts affecting the best interests of the children that were *either not presented to the trial judge or were not known by the trial judge at the time the original custody order was entered.* (Emphasis added.) In the present case, there were material facts that were unknown to the trial court at the time of the divorce and custody proceedings. The fact that appellee sought custody of the parties' daughter on the basis that appellant was involved in a sexual relationship, while at the same time participating in the same conduct, is undisputed. Appellee admitted during his testimony, "I asked the court to take custody away from Heather for the very same thing that I was doing at the time and continued to do afterward." He stated, "In fact, I did the same thing. I don't believe I told that at the divorce hearing." Furthermore, since the entry of the original custody order, appellee has introduced into the child's home and entrusted with primary-care responsibilities a woman who conceived two children out-of-wedlock. Based on this evidence, the trial court

clearly erred in finding that appellant failed to prove a material change in circumstances had occurred.

Once a material change of circumstances was established, the trial court then had the duty to weigh these material changes and consider the best interest of the child. *See Calhoun v. Calhoun*, 84 Ark. App. 158, 162, 138 S.W.3d 689, 691-92 (2003) (reversing where the court found that there was a material change in circumstances but then placed an additional burden on appellant of showing an "adverse impact" on the child, without simply weighing the child's best interest).

We turn now in our de novo review to the evidence concerning the best interest of the child. The Arkansas Supreme Court has stated that "the primary consideration in child-custody cases is the welfare and best interest of the children; all other considerations are secondary." *Hamilton v. Barrett*, 337 Ark. 460, 466, 989 S.W.2d 520, 523 (1999). In this case, the trial court left custody of the child with the appellee because O.H. had been in his custody for some time and seemed to be doing well. However, the evidence showed that the child had originally been placed with him due in large part to the trial court's conclusion that he would provide a better moral example than appellant; a conclusion that has now proven to be incorrect. Appellee has engaged in sexual relationships outside of marriage on at least two occasions since being granted custody of O.H. Further, he placed O.H. in the primary care of his new wife, who herself had one illegitimate child from a previous relationship and who was pregnant by appellee at the time of their marriage. Clearly, appellee never had a claim to the moral high road and has demonstrated that he is less able than appellant to provide a good moral example to O.H.

Further, and most importantly, appellee admits that he is not now nor was he ever the primary caretaker of O.H. He admitted that he expected the stepmother, not himself, to be O.H.'s primary caretaker in the future if he should retain custody. The care and nurture of O.H. should be with a parent and so long as the parent is fit, a stepparent is not an equivalent substitute. As the United States Supreme Court noted in *Troxel v. Granville*, 530 U.S. 57, 65 (2000) (citing *Prince v. Massachusetts*, 321 U.S. 158, 166 (1944)), "It is cardinal with us that the custody, care[,] and nurture of the child reside first in the parents . . ." The law will favor a natural parent over all others if all things are equal. *Devine v. Martens*, 371 Ark. 60, ___ S.W.3d ___ (2007); *Manuel v. McCorkle*, 24 Ark. App. 92, 749 S.W.2d 341 (1988). It is presumed that it is in a child's best interest

to be in the primary care of a parent. In custody cases there is a preference for the parent above all other custodians, and that preference for the natural parent must prevail unless it is established that the natural parent is unfit. *Golden v. Golden*, 57 Ark. App. 143, 942 S.W.2d 282 (1997) (citing *Stamps v. Rawlins*, 297 Ark. 370, 761 S.W.2d 933 (1988)). While these holdings were made in guardianship and grandparent visitation cases, the guiding factor was precisely the same as in the case at bar — the best interest of the child.

■ As appellee himself testified, he routinely worked shifts that would make it impossible on many days for him to ever see O.H. much less provide for her care. Upon our de novo review, we conclude that the trial court's findings regarding O.H.'s best interest were clearly erroneous and clearly against the preponderance of the evidence. We accordingly reverse and remand with instructions to enter an order of custody consistent with this opinion.

Reversed and remanded.

HART, GRIFFEN, HEFFLEY, and MILLER, JJ., agree.

PITTMAN, C.J., GLADWIN, GLOVER, and VAUGHT, JJ., dissent.

DAVID M. GLOVER, Judge, dissenting. This case begs for a petition for review to our supreme court. Today, the majority has simply discarded our standard of review in changing custody of this child from her father to her mother. The majority recites the standard of review for a change of custody, but uncharacteristically declines to follow it. As an appellate court, in equity cases we are required to give due deference to the trial court's superior position to view and judge the credibility of the witnesses, *Noland v. Noland*, 330 Ark. 660, 956 S.W.2d 173 (1997), and this deference is even greater in cases involving child custody, as a heavier burden is placed on the trial court to utilize to the fullest extent its powers of perception in evaluating the witnesses, their testimony, and the best interests of the children. *Anderson v. Anderson*, 18 Ark. App. 284, 715 S.W.2d 218 (1986). A judicial award of custody should not be modified unless it is shown that there are changed conditions that demonstrate that a modification of the decree is in the best interest of the child, or when there is a showing of facts affecting the best interest of the child that either were not presented to the trial court or were

not known by the trial court at the time the original custody order was entered. *Jones v. Jones*, 326 Ark. 481, 931 S.W.2d 767 (1996). Generally, courts impose more stringent standards for modifications in custody than are required for initial determinations of custody. *Id.*

The majority opinion provides only a portion of the trial court's bench ruling to support its tortured decision. The full text of Judge VanAusdall's thoughtful ruling from the bench provides:

> First of all the Court's going to comment about the original decision in which [Brooks] admitted that he was engaged himself in an adulterous relationship at the time of the divorce and that that information was withheld from the Court. The Court agrees with [Heather's] contention that that cast [Brooks] in a bad light with the Court, the Court feeling that not only is he a cheat, but he's a nefarious and devious cheat, and the Court recognizes that. And, of course, that casts questions on the character. And, of course, character is an important factor in determining who should have the children under their tutelage. And had the Court been made known of that at the time — uh — of the initial award, it well may be that the decision of the Court would have been different. But, the Court doesn't know that it would have been or not. So, those cases — all these cases, custody cases, involve — uh — not only the facts and the things that — uh — that bear on the Court's mind, and *it would be speculation, frankly, for the Court to say had that been a fact that had been made known to the Court, the decision would have been different. It well may have been. It would be speculating to say that it would have been.* And even if the Court could come to that conclusion today, we're not dealing with what might have been had it been.
>
> We're dealing with whether or not that there is sufficient reason to engage and change the — uh — custody based upon the law of substantial change in circumstances. We all know that custody is not a matter that is used as a punishment tool or a reward tool. It is a — uh — it is a — uh — decision that you want to be dad-gum sure that your primary focus — big, big focus — is not to worry about going back and rectifying wrongs, or making rewards, or punishing folks. It's just simply to be sure that based upon today's situation the child is — is placed in the best situation that the child could be placed in. So, the Court comes to this conclusion, you hear about the testimony about the need for [Heather] to be the primary caregiver when she's off work and that that's a big change in circumstances, whereas the Court's not sure that is a big change

in circumstances. The testimony was at the time of the divorce [Brooks] was utilizing his aunt and his mother to help take care of the child. And since then — uh — instead of utilizing them, he utilizes his present wife. Now, the Court just doesn't see and find that that is a sufficient reason to call that a change in circumstances. The big thing in the Court's mind today is the child seems to be doing so well and established a nice relationship with — with everybody, seems to be enjoying where she lives, seems to be enjoying the visitation with [Heather], and the Court just doesn't see any reason to take a chance with a change in the custody now that we're settled in. [Brooks] rightfully cites to the Court the law that says you have to have a tougher proof in order to make a change than you would on the initial — the initial award. For all those reasons the Court denies the petition to change custody and orders that the custody remain in the charge of [Brooks].

(Emphasis added.)

### Material Change of Circumstances

#### a. Unknown Information

One of the bases upon which custody was originally granted to appellee Brooks Harrison was that Heather was having a relationship with another man during the pendency of the parties' divorce. Because Heather did not provide any of the testimony from the divorce hearing, we are unable to determine the other reasons why Judge VanAusdall, who presided over both the divorce hearing and the change-of-custody hearing, granted initial custody to Brooks. At the change-of-custody hearing, Heather presented testimony that Brooks also was having an extramarital relationship before the parties were divorced and that he did not disclose that fact to the trial court at the time of the divorce. Brooks admitted those facts. Heather argues that this is a reason to change custody to her, *i.e.*, a material change of circumstances, because this was information that was unknown to the trial court at the time of the entry of the original custody order. I disagree.

First, there is no evidence that Brooks perjured himself at the divorce hearing — it simply appears that Heather failed to propound discovery to Brooks regarding extramarital dating or to ask him about it directly at trial. It cannot be argued that Brooks was required to volunteer this information to Heather. Second, a review of Judge VanAusdall's ruling indicates that all of the

evidence presented by Heather at the change-of-custody hearing, including the evidence concerning Brooks's prior extramarital conduct, was taken into consideration in deciding that there was not a material change in circumstances. Third, custody is not awarded to reward or punish either parent. *Eaton v. Dixon*, 69 Ark. App. 9, 9 S.W.3d 535 (2000). However, that is exactly what the majority has done in this instance — punished Brooks by taking away custody of his daughter for failing to assist his former wife in her prosecution of the original action between the parties.

### b. Other Circumstances

Heather further argues that there has been a material change in circumstances because Brooks married his current wife after she got pregnant; that his second wife had another child out of wedlock; that to a large extent Brooks had turned over parenting responsibilities to his new wife; that Brooks's second wife is not the ideal person to raise her child; that she (Heather) has the ability and desire to spend the most quality time with the child; that she is denied quality time with her child; that she would set a better moral and scholastic example for the child; and that she would be better able to assist in education.

Judge VanAusdall's remarks indicate that he did not find any of these arguments sufficient to establish a material change in circumstances. He is absolutely correct. Heather attacks Brooks's new wife, Melody, because she had a daughter out of wedlock and was pregnant with Brooks's son before they married; however, Heather admitted that one of the men she dated after she divorced Brooks had a child out of wedlock as well. The trial court recognized earlier immaturity in social judgment in both litigants where the evidence showed that they had both crossed into a moral bog at the time of the divorce. Thus, contrary to the majority's comments, neither side has shown itself to be exclusively garrisoned on the moral high ground. The trial court recognized that, through the years, Heather's and Brooks's social actions actually mirrored each other, but they have both improved with age.

With respect to Melody now "raising" O.H., as the trial court recalled, at the time Brooks was originally awarded custody, he was a fire fighter, and his mother and aunt helped with O.H. when he was on duty. Brooks was still a fire fighter at the change-of-custody hearing, and he testified that when he got remarried, Melody took over in large part from Brooks's mother

and aunt helping with O.H. while Brooks was working his shifts. Therefore, the help Brooks requires with O.H. during his shifts has not changed, just the person helping him. Heather testified that she would have to have someone pick up O.H. daily from school and also to stay with O.H. during the summer while she worked. Therefore, by her own testimony, someone other than Heather would be taking care of O.H. during her work times, which renders Heather's stance somewhat hypocritical.

The majority erroneously states that Brooks has turned primary care of O.H. over to Melody, and cites *Troxell v. Granville*, 530 U.S. 57 (2000), for the proposition that the custody, care, and nurture of a child should reside first in the parents. First, *Troxell* has no application to the present case, as it dealt with paternal grandparent visitation rights after the father of the child had died. Second, the custody, care, and nurture of O.H. *did* reside at all times in her parent — her father, Brooks Harrison. Brooks stated that Melody now fulfills the role that his mother and aunt did during his work shifts, but the evidence hardly indicates that Brooks has simply abandoned O.H.'s care to Melody. Brooks testified that he picked O.H. up from school when he was not working, that he helped with homework, that he got the children ready for school, that he cooked for them, and that he took them to school. Brooks testified that he went to O.H.'s activities when he was not at work, and that when he was at work, Melody and the children would sometimes bring him dinner and that he would talk to O.H. on the phone on the nights he was at work. For the majority to characterize Brooks as an absent parent is a gross mischaracterization of the evidence. Regarding Heather's argument that Melody now does "a lot of caring for O.H.," there are few parents that do everything by themselves. Caring stepmothers are to be applauded, not scorned.

Heather argues that she had been denied "quality" time with her daughter, but I fail to see how it is Brooks's fault if Heather cannot make her visitation with O.H. "quality time." There was testimony from Brooks, Melody, and even Heather that Brooks allowed O.H. to spend extra time with Heather, especially when her father was ill. In contrast, it was Heather who refused to work with Brooks during summer visitation to allow Brooks and his family to take a vacation together. Heather's "moral superiority" is not supported by the evidence.

### Best Interests

Notwithstanding that Judge VanAusdall did not find a material change in circumstances to justify changing custody, he nevertheless proceeded to examine the best interests of O.H., finding that she was doing well in Brooks's home, that she was established in Brooks's home, and that she enjoyed having a stepsister her age and a new half-brother. Our standard of review for change of custody is more stringent than for initial determinations of custody. This is for the express purpose of preventing disruption in children's lives and giving them a sense of stability, rather than having their world be in a constant state of flux. There is nothing in O.H.'s life with Brooks that indicates that it is not in her best interest for custody to remain with Brooks, who has done nothing but provide a happy, stable life for O.H. This is clearly indicated by Judge VanAusdall's well-reasoned ruling from the bench, recited in full above.

In the order dismissing Heather's petition to modify the decree, Judge VanAusdall found that Heather "has failed to meet her burden of proof in establishing that there has been a material change of circumstances since the entry of the decree of divorce herein on February 24, 2004, and that it would be in the best interest of the child to modify said decree." Thus, he addressed in detail both prongs: (1) material change of circumstances; and (2) best interest of the child. The majority has erred in reversing this ruling.

As appellate judges, we are permitted to review, under appropriate standards, but not retry, cases that come before us. We do not make findings of fact. We do not determine the credibility of witnesses. Such findings and determinations are rightly made by our trial courts. However, today, in this matter, the majority has usurped that responsibility of the trial courts.

I am authorized to state that Chief Judge PITTMAN and Judges GLADWIN and VAUGHT join in this dissent.