
# ARKANSAS COURT OF APPEALS

DIVISIONS I, II & III

**No.** CV-16-897

| | |
|---|---|
| NATHAN COOPER<br>APPELLANT<br><br>V.<br><br>SHANNON KALKWARF (COOPER)<br>APPELLEE | **Opinion Delivered** June 21, 2017<br><br>APPEAL FROM THE PULASKI COUNTY CIRCUIT COURT, FOURTEENTH DIVISION [NO. 60DR-12-954]<br><br>HONORABLE VANN SMITH, JUDGE<br><br>SUBSTITUTED OPINION ON GRANT OF REHEARING; REVERSED AND REMANDED |

## WAYMOND M. BROWN, Judge

On March 29, 2017, we issued an opinion that reversed the trial court's order granting appellee's petition to relocate with the parties' minor son. Appellee subsequently filed a petition for rehearing, asking this court to reconsider the decision. We accept her invitation, grant the rehearing petition, and issue this substituted opinion.

Appellant Nathan Cooper appeals the order of the Pulaski County Circuit Court granting appellee Shannon Kalkwarf's request to relocate with the parties' minor son. For reversal, appellant contends that the trial court erroneously applied the presumption in favor of relocation as set out in *Hollandsworth v. Knyzewski*.[1] We agree and reverse and remand.

---

[1]353 Ark. 470, 109 S.W.3d 653 (2003).

SLIP OPINION

The parties were divorced by decree on July 9, 2012. At the time of the divorce, the parties had one minor son, B.C. (DOB 5-31-09). The parties entered into an agreement regarding custody, which was incorporated, but not merged, into the decree. According to the agreement, appellee was to have "primary physical custody" of B.C. and the parties were to share "joint legal custody." Appellant was granted "reasonable and liberal visitation with the minor child," which included appellant having the "minor child at a minimum of three nights out of every seven days with two days being consecutive." The holiday visitation schedule alternated each year. Appellant was granted visitation on Father's Day yearly, and appellee was granted yearly visitation on Mother's Day. The visitation schedule was to continue during the summer; however, both parties were allowed "two non-consecutive weeks of vacation visitation during the summer" upon "reasonable notice" to the other party. Each party agreed to contact the other parent for overnight childcare before a third party or non-relative was to care for the child. As for relocation, the agreement stated, "[n]either party shall move the minor child out of the State of Arkansas without express consent in writing from the other party and/or an order from the Court authorizing the removal of the child from Arkansas." Appellant was ordered to pay monthly child support in the amount of $470. He was also required to provide a copy of his W–2 and state and federal personal income tax returns to appellee within thirty days of receipt and/or filing. Appellee was to continue to maintain, at her expense, health insurance for B.C. However, the parties were to equally divide any non-covered medical, dental, orthodontic, or prescription-drug expenses.

SLIP OPINION

Appellee remarried on December 30, 2015. She filed a petition for modification on January 15, 2016, alleging that there had been a material change in circumstances and that it would be in B.C.'s best interest if appellee was allowed to relocate with him. Appellee listed several reasons why she should be allowed to relocate with B.C., including the fact that she had recently remarried, and her husband had accepted a residency in trauma surgery in Houston, Texas. She also stated that she intended to advance her career as an APN in cancer prevention. Appellant filed a response to appellee's petition on February 23, 2016, asserting that he and appellee had shared joint custody of B.C. since the divorce, that he had almost daily contact with B.C., and that he was a "strong presence in [B.C.'s] daily life." He agreed that there had been a material change in circumstances, but he denied the remaining allegations in appellee's petition and asked the court to deny it. Appellant filed a motion for joint custody on June 3, 2016. He alleged that there had been a material change in circumstances that required "modification of the custodial arrangement and visitation schedule to a joint custodial schedule and such is in the best interest of the minor child." Appellant asked that appellee's petition for relocation be denied and that a joint-custody award be entered. Appellee filed a reply to appellant's motion on June 14, 2016, essentially denying the material allegations.

The court held a hearing on the parties' petitions on July 11, 2016. Appellee testified that her husband, Kyle Kalkwarf, had accepted a fellowship in trauma surgery at UT Houston. She stated that he started his fellowship on July 1 and that he was currently living in Houston. She asked the court to allow her to relocate to Houston so that she and B.C. could join Kyle.

She said that she and appellant shared joint legal custody of B.C. She testified that she and appellant modified the visitation schedule so that she had B.C. eight out of fourteen nights and appellant had B.C. six out of fourteen nights.[2] She stated that they received the same number of days with B.C. as required by the decree but that they swapped some days so that B.C. would not have to go back and forth as often. She said that she was formerly employed at UAMS as a nurse practitioner and as a teacher in the College of Nursing at UAMS. She stated that she had recently ended that employment in contemplation of moving to Houston. She testified that she had recently been offered a position at the School of Nursing in Houston as an instructor. She stated that this position included a twenty-one percent increase in salary. She said that they had found a rental home in close proximity to the hospital as well as the elementary school B.C. would be attending. She testified that Kyle was required to complete two years of a trauma fellowship, and that after that, there was a "possibility" that they would return to Arkansas if he was hired by UAMS.

Appellee stated that she and appellant had a "pretty good working relationship" in regard to custody. However, she stated that they also had issues. She testified that B.C.'s Arkansas family included paternal and maternal grandparents, aunts, uncles, and cousins. She stated that Kyle had some extended family in Texas, including his parents who live in San Antonio. She said that B.C. attended Christ the King, which is a private school, for kindergarten and first grade. She stated that tuition was $6,000 a year and that it was expected

---

[2]Appellant would have him five nights, then appellee would have him five nights, then he would go back to appellant for a night before returning to appellee for three nights.

to increase to $6,400 the next school year. Appellee stated that she was solely responsible for B.C.'s tuition, although she and appellant both discussed where B.C. would attend school. She said that after-school care cost her an additional $2,500 a year. She stated that she purchased uniforms for B.C. for both her home and appellant's home. She acknowledged that appellant paid his child support and that he did provide some clothing for B.C. However, she maintained that it was she who provided the majority of the clothing for B.C. She stated that appellant was responsible for B.C.'s haircuts but that there had been instances in which he sought reimbursement from her. Appellee stated that appellant had not shared in the out–of–pocket medical, dental, etc. expenses as ordered by the decree. However, she also stated that she had only asked him once, and he failed to do so. Appellee said that she was active in coming to parties and other activities at B.C.'s school. She stated that before her petition for modification, appellant's participation had been very minimal. She testified that after the divorce, appellant told her that he would not contribute to a college fund for B.C. because he was still paying off his student loans. Appellee stated that Kyle's parents had started a college fund for B.C. and had placed $64,000 in it. She said that she had a master's degree and that her new job in Houston would allow her to continue her education. She stated that B.C. attended camp during the summer and that she paid the weekly tuition even if B.C. was with appellant that week because appellant had never volunteered to pay it.

Appellee had formulated a visitation schedule in case she was allowed to relocate with B.C. This schedule included the following: (1) she would pay for B.C. to fly to Arkansas once a month; (2) appellant could fly to Texas once a month, at his expense; (3) they would

rotate a week at Christmas; (4) appellant would have B.C. every spring break; and (5) appellant would have B.C. for six weeks in the summer, with appellee coming maybe two weekends during this time. According to this schedule, appellee stated that appellant would be able to see B.C. 110 days out of the year. She acknowledged that this was a cut from the 156 days a year appellant had been awarded per the decree. Appellee stated that she began keeping a calendar of the amount of time each of them spent with B.C. in 2014 and that from June 2014–January 2015, she had B.C. sixty-five percent of the time to appellant's thirty-five percent. She stated that in 2015, she had B.C. sixty percent of the time to appellant's forty percent.

Appellee stated that she had known Kyle for four years and that they dated three-and-a-half years before they were married. She said that B.C. has a great relationship with Kyle and that, based on B.C.'s memory, Kyle had always been there. She testified that B.C. is aware that appellant is his father and that B.C. loves appellant. She stated that she was not seeking reimbursement for her out-of-pocket expenses. She said that she just wanted to be allowed to relocate with B.C.

On cross-examination, appellee acknowledged that the divorce decree did not require anyone to pay for college tuition or to reimburse the other party for expenses not specifically listed in the decree. She stated that although she and appellant had some communication issues,[3] she never petitioned the court to intervene. Appellee stated that she and appellant

---

[3]Some of the issues included: (1) appellant did not send a jacket to school one day, (2) appellant did not respond at all about spelling tests, (3) appellant missed one parent-teacher conference, and (4) appellant picked B.C. up and only texted that he was doing so instead of

would share B.C.'s first day of school and Christmas together with B.C. regardless of who had him for visitation. She said that the only extended family they had in Texas was Kyle's parents but that her parents were "contemplating maybe in the future getting a place in Houston." She stated that B.C. had never stayed the night with Kyle's parents but that Kyle's mother, Sharon, had kept B.C. for a few hours at a time.

Appellee stated that when she and appellant were divorced in 2012, they felt it was better for both parents to have more regular contact with B.C. due to his young age. She said that she owns a home in Little Rock, but that she pays mortgage to Kyle's parents. She stated that she wanted to relocate to Houston so that B.C. would not have to rotate between so many homes. She testified that in two years they would either be in the Houston area or back in Arkansas. Appellee said that she would not have been able to keep her job at UAMS even if she was not allowed to relocate because she would be traveling back and forth between Houston and Little Rock. She stated that she believed it was in B.C.'s best interest that she be allowed to relocate. She said that Kyle could be making about $200,000 as a general surgeon right now but that the fellowship would allow him to make double that amount. She admitted that one reason she wanted to relocate was because appellant said that he could not pay for B.C.'s college but that Kyle was "willing to step in on that." She opined that appellant and B.C. had a "good relationship" but that it was not "exceptional."

---

calling.

Kyle testified that he was a surgeon and that he was currently involved in a fellowship in trauma and critical care surgery in Houston. He stated that after his fellowship he could "pretty much work anywhere, but focus primarily on areas that are large enough to sustain a trauma population or a critical care population of patients to take care of." He said that he has known appellee for four years and that he has known B.C. for "probably six-months less" than he has known appellee. He described his relationship with B.C. as very good. He stated that he chose a residence based on its proximity to where B.C. would be attending school. He said that his parents lived in San Antonio and that B.C. "loves them very much." He said that B.C. being able to move to Houston had both positive and negative implications. Kyle stated that he once had a mortgage through his parents and that when he sold his home, he paid off the mortgage and transferred it to appellee's home. He said that he was renting a home in Houston because he was unsure of his permanency in Houston. He stated that B.C. had seen the home and the school he would be attending in Houston.

On cross-examination, Kyle stated that he applied "broadly" for fellowships beginning as early as April 2015. He said that he was in a relationship with appellee when he was sending applications to various institutions. He admitted that he could not tell the court where he would be in two years because it all depended on the hiring process. He stated that he earned a salary of $50,000 as a resident at UAMS and that his fellowship salary would be $65,000, resulting in an eighteen-percent increase. Kyle stated that he would be able to afford the home he chose in Houston with his salary. He said that he was financially committed to the home for two years because he had signed a two-year lease.

Jeannie Thompson, appellant's girlfriend's mother, testified that she considered B.C. one of her grandchildren. She stated that she met B.C. approximately two months after appellant started dating her daughter, Jessica, and that they had spent a lot of time together as a family since then. She opined that appellant placed spending time with B.C. at the top of his list. She also stated that B.C. got along well with Jessica's thirteen-year-old daughter, B.T.

Appellant testified that the visitation schedule was changed to give B.C. more consistency during the school week. He stated that the communication between him and appellee had decreased since appellee filed her petition. He said that when he and appellee first were divorced, they would spend at least the mornings of the major holidays together doing things as a family. Appellant stated that he worked next door to B.C.'s school, which allowed him "additional opportunities" to see B.C. He said that he began keeping up with the times he was actually able to see and spend time with B.C. According to his table, between August 2014–December 2014, he was able to see and spend time with B.C. sixty-one percent of the time. In 2015, appellant was able to see and spend time with B.C. sixty-three percent of the time.[4] And he was able to see and spend time with B.C. sixty-five percent of the time between January 2016–May 2016. He stated that he was present at ninety percent of B.C.'s practices (baseball and/or soccer). He presented the court with milestone photographs, including when B.C. was born, yearly first-day-of-school photos, and holidays.

---

[4]This included being able to see B.C. eighty-one percent of the time in March and seventy-seven percent of the time in April.

He testified that his parents resided in Little Rock and that they had a great relationship with B.C. He stated that his sister and her family also lived nearby and that B.C. was close to them. He said that he participated as much as he could at B.C.'s school activities before appellee filed her petition, but that since that time, he tries not to miss any opportunity to spend time with B.C.

Appellant admitted that there was a time that he was "nickel-and-diming" appellee, but he stated that it had stopped. He also admitted that appellee had purchased uniforms for his house, and he said that he was "very much appreciative." He stated that he did not realize it was "such an issue for her." He said that he and appellee jointly decided that B.C. should attend Christ the King, but that he was never asked or told that he would be responsible for half of the tuition. He stated that he assumed some of the child-support payments were going toward the school's tuition. He testified that he packed lunches for B.C. everyday. He stated that he filed the motion for joint custody because he wanted the court to adopt the practices he and appellee had lived by for the past two years. He said that he was not trying to take custody of B.C. away from appellee, but that he wanted appellee's petition for relocation to be denied. He stated that he was concerned about the mental and academic strain relocation would place on B.C. Appellant testified that he did not believe appellee would move if she was not allowed to take B.C. with her.

On cross-examination, appellant stated that he wanted to keep the visitation arrangement he and appellee currently had. He testified that he was awarded joint legal custody in the decree based on the parties' agreement. He also said that they agreed that

appellee should be the primary physical custodian. Appellant testified that to him, joint legal custody meant that he had every legal right to B.C. as appellee had and that they would have an equal amount of time with B.C. He testified that it was explained to him at the time of divorce that appellee would be the primary physical custodian because she "had one more day a week" than he had with B.C. He said that he understood that "if there was an argument that [they] couldn't settle, that [appellee] got the last vote" as the primary physical custodian. However, he stated that this did not mean relocation. Appellant reiterated that he believed that his child support was being used to help pay for tuition at Christ the King. He stated that he purchased several sets of uniforms for B.C. to have at his house in addition to those purchased by appellee. He opined that he had met all of the responsibilities associated with having B.C. He stated that he was opposed to B.C. relocating with appellee because relocation would prevent appellant from maintaining the same "loving relationship" he currently shared with B.C.

The court entered an order on August 4, 2016, finding that appellee's relocation was controlled by *Hollandsworth*,[5] not *Singletary v. Singletary*.[6] According to the court, it was unclear whether the parties had joint custody as contemplated by *Singletary*,[7] or if one party

---

[5] *Supra.*

[6] 2013 Ark. 506, 431 S.W.3d 234.

[7] *Id.*



enjoyed sole or primary custody as contemplated by *Hollandsworth*.[8] The order stated in

pertinent part:

23. As noted above, the parties' Agreement states "wife will have primary physical custody of the minor child, subject to the reasonable and liberal visitation with husband as set out below in this Agreement. The parties will share joint, legal custody." The Agreement fails, however, to define the meaning of primary physical custody.

24. In both Singletary and Jones courts were confronted with similar situations where language was ambiguous. Singletary, 2013 Ark. 506 at 9; Jones, 2015 Ark. App. 468 at 10. In both cases, the court looked to the contract between the parties in its entirety, the testimony of the parties about their intent, and the conduct of the parties. Id.

25. The parties initially agreed that "Husband will have the minor child at a minimum of three (3) nights out of every seven (7) days with two (2) days being consecutive." The Agreement is ambiguous, however, as it does not specify which parts of the three (3) days the Defendant will have as his visitation, particularly when he only has two (2) days consecutively. Still, the division of time was clearly not 50/50.

26. Both parties testified that they later mutually agreed to a modification of the Agreement arriving at the aforementioned 5-5-1-3 visitation rotation they currently practice.

27. This 5-5-1-3 rotation unambiguously placed the child with the Defendant six (6) days out of fourteen (14) or approximately 42.9% of the time.

28. The Agreement further provides that Defendant will pay child support of $470.00 per month to the Plaintiff.

29. The Defendant testified that the phrase "primary physical custody" meant the Plaintiff had the final say on matters such as medical decisions. The Defendant also testified that Plaintiff was the primary physical custodian because she had B.C. one more day per week than he did.

30. The Plaintiff testified that she enrolled B.C. in private school and bore the cost of the same, that she bought the majority of B.C.'s clothes, paid for B.C.'s haircuts, and took B.C. to all of his doctor's appointments.

---

[8] *Supra.*

31. Given the Agreement in its entirety, the intent of the parties, and the conduct of the parties the Court finds that the parties did not enjoy true joint custody.

32. Where parties do not share joint custody, one party must necessarily be the primary custodian. In the present case, even with the modification to a 5-5-1-3 schedule, the Plaintiff remains the primary custodian of B.C. as was set out in the Decree.

33. Accordingly, the Court utilizes the Hollandsworth factors to decide the issue of relocation and presumes that it would be in B.C.'s best interest to relocate with the Plaintiff. The Court considers the Defendant's case as an attempt to rebut that presumption.

. . . .

54. The Plaintiff's Petition for Modification is granted, and the Defendant's Motion for Joint Custody is denied.

55. The Court notes that the area of relocation law is not clear, and that there appears to be no bright line test as to when Hollandsworth applies or when Singletary and Jones apply, other than when the facts and language in the custody order are unambiguous. As in the present case, and in other cases this Court has heard, the facts dictate which test to use, and the decision to use either Hollandsworth or Singletary can drastically affect the outcome. Often, the facts presented to the Court are so close that one or two small details will push the Court to utilize one case over the other which can change the outcome of the decision.

56. It is not this Court's place to suggest a change in the relocation law, but it appears that the better test would always place the burden on the party wishing to relocate and put more emphasis on what is in the best interest of the child in making the decision.

The court put a visitation schedule in place that it felt would be in B.C.'s best interest. This schedule offered appellant more time with B.C. than the schedule appellee had proposed.[9]

The court noted that the visitation schedule proposed by appellee would dramatically reduce

---

[9]Appellee proposed a visitation schedule of 110 days a year, if appellant traveled to Houston once a month. Otherwise, visitation could drop as low as eighty-three days in a year.

the 219 days a year that it found appellant was able to see B.C. Appellant filed a timely notice of appeal. This appeal followed.

We review traditional cases of equity de novo on the record.[10] While we will not reverse factual findings by the trial court unless they are clearly erroneous, a trial court's conclusion of law is given no deference on appeal.[11]

Appellant argues that the trial court erred by applying the presumption in favor of relocation as set out in *Hollandsworth*.[12] More specifically, appellant contends that the appropriate line of cases should have been *Singletary*[13] and *Jones*[14] because this was a joint-custody case. We agree.

In *Singletary*, our supreme court held that in joint-custody relocation cases, the focus is whether or not there has been a material change in circumstances and the best interests of the children. As in *Singletary*, the trial court was faced with ambiguous language: on one hand the parties are to share joint legal custody; and on the other hand, appellee is named the primary custodian. When a contract is ambiguous on its face, we resolve the ambiguity by

---

[10] *Williams v. Nesbitt*, 2012 Ark. App. 408, 421 S.W.3d 320.

[11] *Id.*

[12] *Supra.*

[13] *Supra.*

[14] 2015 Ark. App. 468, 469 S.W.3d 402 (where this court affirmed the trial court's reliance on *Singletary* when denying appellant's petition to relocate.).

looking at other parts of the contract and the parties' testimony about what they intended, as well as their conduct.[15]

Here, appellant testified that he understood joint custody to mean that he and appellee would have an equal amount of time with B.C. He stated that as it was explained to him, appellee was designated the primary physical custodian because B.C. was in her custody one more day out of a week than in appellant's custody. He presented the court with evidence showing that he actually spent over sixty percent of the days out of the year with B.C., although the decree called for only approximately forty-three percent. Appellee presented evidence that B.C. was with her over sixty percent of the time; however, she did not contest the amount of time appellant claimed to have spent with B.C. Additionally, both parties testified that they would spend time as a family unit during major holidays, as well as milestone occasions, after the divorce. Based on this evidence, we hold that the court improperly relied on *Hollandsworth*.[16] Therefore, we reverse and remand to the trial court for further proceedings consistent with this opinion.

Reversed and remanded.

GRUBER, C.J., and GLOVER and HIXSON, JJ., agree.

VIRDEN, J., concurs.

ABRAMSON, KLAPPENBACH, WHITEAKER, and VAUGHT, JJ., dissent.

---

[15] *Rockefeller v. Rockefeller*, 335 Ark. 145, 980 S.W.2d 255 (1998).

[16] *Supra.*

SLIP OPINION

**BART F. VIRDEN, Judge, concurring.** I join the majority and write a somewhat reluctant concurrence. The trial court clearly put a great deal of thought into its decision, and its frustration was clear from the findings in the order. I share that frustration and acknowledge the validity of the position taken by the dissent. Inasmuch as this is a 5–4 decision, I fully expect the Arkansas Supreme Court to review the matter and settle what I and the trial court perceive as a confusing and amorphous body of law regarding joint custody and relocation of parents.

I am writing to bring attention to an ambiguity in our caselaw regarding "joint custody." Historically, custody of minor children was placed with one parent and the other parent received visitation. As the family dynamic evolved, our courts and laws struggled to keep pace. Terms like "joint legal custody" and "primary physical custody" began to appear in divorce decrees with little or no guidance to the meaning of those terms. As a result, we do not have a hard–and–fast rule to determine whether the parties had true joint custody. Our legislature has determined that it is public policy of our state to favor joint custody. *See* Ark. Code Ann. § 9-13-101(a)(1)(A)(iii).

The "*Hollandsworth* presumption" was born from the traditional custody/visitation arrangement wherein the parent who has custody, has, in essence, been raising the child and will continue to do so, albeit in a new location. But not all cases are clear-cut regarding whether true joint custody exists. As expressed by the trial court, determining whether joint custody exists in cases such as this one is quite difficult. The logic for not applying the

16

*Hollandsworth* presumption in a case that is so very nearly true joint custody is sound. The trial court concluded that

> It is not this Court's place to suggest a change in the relocation law, but it appears that the better test would always place the burden on the parent wishing to relocate and put more emphasis on what is in the best interest of the child in making the decision.

I am not so constrained, and I believe the trial court was right on the mark with the suggestion. I am convinced that no consideration was given to the overriding concern of the best interest of the child, which has been the polestar in every type of case dealing with the care and custody of children. *See Stehle v. Zimmerebner*, 375 Ark. 446, 454, 291 S.W.3d 573, 579 (2009) ("It is well settled in Arkansas that a judicial award of custody will not be modified unless it is shown that the circumstances have changed such that a modification of the decree would be in the best interest of the child."); *Chastain v. Chastain*, 2012 Ark. App. 73, at 12, 388 S.W.3d 495, 502 (When the trial court does not specifically state that relocation was in the children's best interests, if our de novo review shows that the lower court considered the appropriate factors relevant to best interest, an appellate court may conclude that the evidence supported the decision.); *Bowen v. Bowen*, 2012 Ark. App. 403, 421 S.W.3d 339 (In grandparent visitation cases there is a rebuttable presumption that the custodian's denial or limitation of visitation is in the best interest of the child.); *Hamman v. Ark. Dep't of Human Servs.*, 2014 Ark. App. 295, 435 S.W.3d 495 (Parental rights must give way to the best interest of the child when the natural parents seriously fail to provide reasonable care for their minor children.).

SLIP OPINION

**LARRY D. VAUGHT, Judge, dissenting.** I dissent from the substituted opinion on the petition for rehearing. Based on our standard of review, I would affirm the circuit court's order.

The majority briefly states the standard of review in child-custody cases. I will elaborate. We have traditionally reviewed matters that sounded in equity de novo on the record with respect to factual questions and legal questions. *Hollandsworth v. Knyzewski*, 353 Ark. 470, 475, 109 S.W.3d 653, 656 (2003). We have stated repeatedly that we will not reverse a finding by a circuit court in an equity case unless it was clearly erroneous. *Id.*, 109 S.W.3d at 656. Further, we give due deference to the superior position of the circuit court to view and judge the credibility of the witnesses. *Geren Williams v. Geren*, 2015 Ark. App. 197, at 9–10, 458 S.W.3d 759, 766. This deference is even greater in cases involving child custody, as a heavier burden is placed on the trial judge to fully use his or her powers of perception in evaluating the witnesses, their testimony, and the best interest of the children. *Id.* at 10, 458 S.W.3d at 766. De novo review does not mean that the findings of fact of the circuit judge are dismissed out of hand and that the appellate court becomes the surrogate circuit judge. *Stehle v. Zimmerebner*, 375 Ark. 446, 455–56, 291 S.W.3d 573, 580 (2009). What it does mean is that a complete review of the evidence and record may take place as part of the appellate review to determine whether the trial court clearly erred in either making a finding of fact or in failing to do so. *Id.* at 546, 291 S.W.3d at 580.

In an eleven-page fifty-six-paragraph order, the circuit court made detailed factual findings, from its "superior position" to evaluate the witnesses and the best interest of B.C.

and explained why Shannon had primary custody of him. Accordingly, it proceeded to apply the *Hollandsworth* factors, and it found that relocation was in B.C.'s best interest. In reversing the circuit court's order, the majority did not address any of these findings, much less explain why those findings were clearly erroneous. In one paragraph of a fifteen-page opinion, the majority simply cherry-picks a small portion of the testimony and independently weighs it in a way that supports its preferred outcome. This was hardly an appropriate application of our required standard of review. The majority simply "dismissed out of hand" the circuit court's findings of fact and acted as the "surrogate trial judge." *Stehle*, 375 Ark. at 455–56, 291 S.W.3d at 580.

Based on *Singletary v. Singletary*, 2013 Ark. 506, 431 S.W.3d 234, and *Jones v. Jones*, 2015 Ark. App. 468, 469 S.W.3d 402, the circuit court considered the language of the parties' divorce decree and found it ambiguous. Then, based on *Singletary* and *Jones*, the circuit court looked to the conduct of the parties and their testimony about what they had intended the custody arrangement to be. In doing so, the court found that (1) Nathan had custody of B.C. 42.9 percent of the time, which was not a 50/50 split between the parties; (2) Nathan was ordered to pay child support; (3) Nathan's understanding of the phrase "primary physical custody" meant that Shannon had the final say on matters and that she had one more day per week with B.C. than Nathan did; (4) Shannon enrolled B.C. in private school and paid for it; (5) Shannon bought the majority of B.C.'s clothes; (6) Shannon paid for B.C.'s haircuts; and (7) Shannon took B.C. to all of his doctor's

appointments. Based on these findings, the circuit court found that the parties did not share joint custody of B.C.[1]

In reversing this finding, the majority ignores the findings made by the circuit court and its superior position to evaluate the witnesses. Rather than explain any clear error in the circuit court's findings, the majority makes new findings and weighs them in favor of Nathan.

While we might have decided this case differently had it been tried to us, our role on appellate review is not to retry a case. As appellate judges, we are permitted to review, under appropriate standards, but not retry, cases that come before us. We do not make findings of fact. We do not determine the credibility of witnesses. Such findings and determinations are rightly made by our circuit courts. *See Harrison v. Harrison*, 102 Ark. App. 131, 139, 287 S.W.3d 601, 608 (2008). The circuit court made substantial findings of fact to support its decision. These findings have a firm basis in the evidence and are not clearly erroneous. Accordingly, our standard of review dictates that we affirm the circuit court's finding that the parties did not share joint custody.[2]

ABRAMSON, KLAPPENBACH, and WHITEAKER, JJ., join in this dissent.

---

[1]On de novo review, additional evidence supports the circuit court's finding. Shannon testified that she had custody of B.C. 60 percent of the time in 2014 and 2015. Nathan filed a motion for joint custody, and at trial testified, "I would have loved to have equal custody."

[2]The significance of the standard of review is demonstrated in our holdings in *Singletary* and *Jones*, the cases on which the majority relies. In those cases, we *affirmed* the circuit courts' findings of joint custody. In fact-intensive cases like the instant case, our standard of review—in which we give due deference to the circuit court to fully use its powers of perception in evaluating witnesses, their testimony, and the best interest of the child—makes all the difference.



*LaCerra, Dickson, Hoover & Rogers, PLLC*, by: *Lauren White Hoover*, for appellant.

*D. Paul Petty*, for appellee.